UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                              Case No:  2:14-cr-128-FtM-29DNF

ANTHONY BAKER
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

    **I.**    **Introduction**

This cause is before the Court on the Motion to Suppress Tangible Evidence and Statements; Memorandum of Law and Specific Request for Evidentiary Hearing (Doc. 29) filed by Defendant Anthony Baker ("Defendant") on March 9, 2015.  The Government filed a Response in Opposition to Defendant Anthony Baker's Motion to Suppress (Doc. 34) on March 24, 2015.  Defendant is charged with: (1) knowingly and willfully conspiring, confederating and agreeing, with other persons known and unknown to the Grand Jury, to possess with intent to distribute 500 grams or more of a mixture of a substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II); and (2) knowingly possessing with intent to distribute and aid and abet the possession with intent to distribute 500 grams or more of a mixture of a substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II), and 18 U.S.C. § 2.  Defendant is seeking to suppress all evidence derived from a traffic stop involving Defendant on April 12, 2013, in the area of I-75, mile marker 123, Lee County, Florida.  This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held before the undersigned on April 8, 2015.  For the reasons explained

below, the Court respectfully recommends that Defendant's motion be **DENIED**.

**II.     Evidence**

The Government presented the testimony of two witnesses: Detective Stephen Kirkby and Captain Pete Hedrick. The Government entered one exhibit into evidence: a compact disc containing an audio/video recording of the April 12, 2013, traffic stop. Defendant called no witnesses and entered no exhibits.

**A.  Testimony of Detective Stephen Kirkby**

Detective Stephen Kirkby testified as follows. He began working for the Lee County Sherriff's Office in June 2005. (Tr.[1] 5). He previously worked as a road patrol deputy and is currently a detective in the special investigation division, where he has served for the past eight years. (Tr. 6). Prior to joining the Lee County Sheriff's Office he served in the Navy for six years. (Tr. 6).

On April 12, 2013, at approximately 2:00 a.m., Detective Kirkby encountered Defendant during a traffic stop in Lee County just north of Corkscrew. (Tr. 6-7). He first observed the vehicle Defendant was in around mile marker 115/116 at the county line between Lee County and Collier County on Interstate 75. (Tr. 7). Defendant's vehicle, a white Toyota Camry, was traveling at a high rate of speed. (Tr. 7). Detective Kirkby visually estimated the speed to be around 79 miles per hour and got a visual reading of 79 miles per hour from his radar unit. (Tr. 7). He waited for the vehicle to pass his location before pulling out behind it. (Tr. 7-8).

It took approximately one to one and a half miles for Detective Kirkby to catch up to the vehicle. (Tr. 8). Detective Kirkby observed the vehicle change lanes for no apparent reason. (Tr. 8). When Detective Kirkby caught up to the vehicle, it slowed down and Detective Kirkby was

---

[1] "Tr." refers to the Transcript (Doc. 47) of the motion to suppress evidentiary hearing held on April 8, 2015.

able to pace the vehicle at 74 miles per hour around mile marker 120. (Tr. 8).  As the vehicle got closer to Corkscrew, where there is more lighting in the area, he pulled up alongside the vehicle and was able to see two silhouettes. (Tr. 8).  Detective Kirkby was able to see that neither the driver nor the passenger were wearing seat belts. (Tr. 8).  Detective Kirkby noted that the driver leaned back behind the B pillar of the vehicle to avoid being seen. (Tr. 43).

As Detective Kirkby got closer to the vehicle, it accelerated back up to 79 miles per hour. (Tr. 9).  The vehicle then changed lanes from the middle lane to the outside lane. (Tr. 9).  The vehicle swerved while it was inside the outside lane. (Tr. 9).  About six times the vehicle crossed the solid white line on the shoulder and then crossed the hash marks that separate the middle and outside lane. (Tr. 9).  At that point, Detective Kirkby initiated the traffic stop. (Tr. 9).

Detective Kirkby stopped the vehicle, exited his truck, and went around to the passenger's side of the white Toyota Camry and made contact with two male occupants from the passenger window. (Tr. 9).  Defendant was in the passenger seat and Markeith Reshay Brown was driving. (Tr. 9-10).  Detective Kirkby talked with the driver while Defendant sat and stared out the front window. (Tr. 10).  Defendant did not make eye contact with Detective Kirkby and did not intervene in any of the questions posed by Detective Kirkby to Mr. Brown. (Tr. 10).

Detective Kirkby explained to Mr. Brown who he was, why he stopped the vehicle, and asked Mr. Brown for his driver's license, vehicle registration, and explained to him that so long as his license came back valid and there were no issues, that he would be issued a written warning for the traffic violations. (Tr. 10-11).  Mr. Brown provided his driver's license, but could not find the vehicle's registration. (Tr. 12).  Mr. Brown and Defendant both appeared very nervous to Detective Kirkby. (Tr. 11).  Mr. Baker's chest and stomach were moving at a rapid rate and his hand was shaking uncontrollably while he was trying to hand his license to Detective Kirkby. (Tr.

11). Detective Kirkby tried to match his breathing to the passengers' breathing and found it uncomfortable. (Tr. 11).

Detective Kirkby then asked Mr. Brown to exit the vehicle and step back to his police vehicle. (Tr. 12). Mr. Brown walked back to the police vehicle very rapidly, which struck Detective Kirkby as odd, as drivers usually will either walk side-by-side or behind the officer when walking towards a police vehicle. (Tr. 12-13).

Detective Kirkby asked Mr. Brown to stand in between his passenger door and the seam where the door opens, as is customary given the way the police vehicles, Chevrolet Tahoes, are set up. (Tr. 13). While Mr. Brown was positioned outside of the passenger door, Detective Kirkby was able to access his computer inside the Tahoe. (Tr. 13).

Within a minute or two after the initial stop of the vehicle, Captain Hedrick arrived on-scene in his vehicle. (Tr. 14). Captain Hedrick was aware what was occurring before he arrived on-scene due to the radio dispatch. (Tr. 14). Detective Kirkby and Captain Hedrick were working in tandem at the time. (Tr. 14). When Captain Hedrick arrived on-scene, Detective Kirkby was conversing with Mr. Brown. (Tr. 14). Detective Kirkby was explaining to Mr. Brown why he was stopped. (Tr. 14). Detective Kirkby explained that Mr. Brown was stopped due to safety reasons based on his driving pattern and the fact that it was wet and he was traveling at a high rate of speed. (Tr. 14). Detective Kirkby also discussed the importance of wearing a seat belt. (Tr. 14). Detective Kirkby was just starting to look at Mr. Brown's license when Captain Hedrick arrived. (Tr. 14-15). Detective Kirkby handed Mr. Brown's license to Captain Hedrick and returned to the Toyota Camry to see if Defendant had been able to find the vehicle's registration. (Tr. 15).

Defendant had found the vehicle's registration and gave it to Detective Kirkby. (Tr. 15). The registration revealed that the Toyota Camry was registered to a female that was not present at

the time. (Tr. 15). After securing the registration, Detective Kirkby returned to the police vehicle and finished the warning. (Tr. 16). While at his vehicle, Detective Kirkby questioned Mr. Brown about the purpose of his trip. (Tr. 16). Mr. Brown explained that they drove down to take his cousin to the Miami area, stayed for a day, and were heading back north to the Tampa/Orlando area. (Tr. 16).

After conversing with Mr. Brown, Detective Kirkby had a conversation with Defendant. (Tr. 16). While Defendant was looking for the registration, Detective Kirkby asked Defendant how his night was going, where they were going, where they were coming from, and the purpose of their trip. (Tr. 16). Defendant told Detective Kirkby that they had driven to Miami, stayed for two days, brought down Mr. Brown's cousin, hung out with some friends, and were heading back north. (Tr. 16). Detective Kirkby noted that there were discrepancies between the stories told by Defendant and Mr. Brown. (Tr. 16-17). While both stated that they had driven to Miami to drop off a friend, their stories were different as to how long they had been in Miami and what they had done in the city. (Tr. 17). Detective Kirkby testified that one of them stated they hung out with friends, got something to eat, and went to a few gentlemen clubs, the other one said they hung out with family and got something to eat. (Tr. 17).

Detective Kirkby told Mr. Brown and Defendant that their stories were different and Mr. Brown then stated that he had actually flown to Miami, Defendant had brought down his cousin, and that he was just driving back. (Tr. 17). Mr. Brown told Defendant to be quiet at that point. (Tr. 17).

Within seven minutes after the stop of the vehicle Detective Kirkby and Captain Hedrick were able to determine that Mr. Brown and Defendant had valid driver's licenses. (Tr. 18). Detective Kirkby asked Mr. Brown whether he could search the vehicle. (Tr. 18-19). Based on

the discrepancies between Mr. Brown and Defendant's stories, and their nervous behavior, Detective Kirkby believed that some type of criminal activity was occurring. (Tr. 18). When Detective Kirkby first asked Mr. Brown for consent to search, he had not gotten back all the information from the computers that had been inquired. (Tr. 19-20). Mr. Brown stated that the vehicle was not his, but belonged to Defendant's wife. (Tr. 19). Mr. Brown did not give consent and told Detective Kirkby to ask Defendant whether the vehicle could be searched. (Tr. 19).

Captain Hedrick approached Defendant who was inside the Toyota Camry. (Tr. 20). Captain Hedrick came back to the police vehicle with Defendant. (Tr. 20). Captain Hedrick then pulled his K-9 partner, Bucky, and did a sniff of the vehicle while Detective Kirkby was still issuing the warning. (Tr. 20). Captain Hedrick pulled Bucky out of his vehicle at approximately 2:09 or 2:11 a.m. (Tr. 20). Captain Hedrick ran Bucky around the vehicle and Bucky alerted to the vehicle. (Tr. 20-21).

Defendant was standing in the front of the police vehicle while Captain Hedrick was running Bucky around the vehicle. (Tr. 21). Mr. Brown was standing between Detective Kirkby and Captain Hedrick's police vehicles. (Tr. 21). While Captain Hedrick was running Bucky around the vehicle, Mr. Brown would not look at the vehicle, but was looking off to the east. (Tr. 21). Defendant looked down and also looked at the sky, but did not make eye contact with Detective Kirkby. (Tr. 21).

After Captain Hedrick ran Bucky around the vehicle he placed him back inside his vehicle. (Tr. 22). Captain Hedrick then explained to Mr. Brown and Defendant that his dog had alerted to the odor of narcotics and that he was going to search the vehicle. (Tr. 22). Captain Hedrick then went and searched the vehicle. (Tr. 22). Captain Hedrick looked in the trunk and then immediately went to the passenger's side. (Tr. 22). Based on how long he had worked with Captain Hedrick,

Detective Kirkby knew that he had found something while conducting the search. (Tr. 23). Captain Hedrick then came walking back towards the police vehicle, asked Mr. Brown and Defendant if they had ever had their rights read to them and asked them both to place their hands on the hood of the police car. (Tr. 23). Defendant complied but Mr. Brown attempted to flee on foot. (Tr. 23). Detective Kirkby was able to apprehend Mr. Brown. (Tr. 23). Captain Hedrick told Defendant to lay down and then assisted Detective Kirkby in handcuffing Mr. Brown. (Tr. 23).

Detective Kirkby testified that the factors that caused him make the traffic stop were the traffic infractions of speeding and the failure to wear a seat belt. (Tr. 24). Also, Detective Kirkby noted the behavioral changes in the vehicle based on the driver switching lanes for no apparent reason because of the psychological effect that it had when they saw his marked patrol car. (Tr. 24). Detective Kirkby also testified that he decided to ask for consent to search the car due to Mr. Brown and Defendant's nervousness and the discrepancies in their stories. (Tr. 24).

Responding to questions posed by the Court, Detective Kirkby testified that his Chevy Tahoe is a marked police vehicle. (Tr. 25). Detective Kirkby further testified that all officers have K-9 units. (Tr. 25). Detective Kirkby also had his own K-9 with him the night in question. (Tr. 26).

On cross examination, Detective Kirkby testified that Captain Hedrick arrived on-scene within two minutes after he initially conducted the traffic stop. (Tr. 26). When Detective Kirkby pulled the Toyota Camry over, he positioned his police vehicle a couple car lengths behind the Camry and at a bit of an angle. (Tr. 27). Detective Kirkby testified that when he requested Mr. Brown's driver license and registration, Mr. Brown immediately complied. (Tr. 28). Detective Kirkby did not request a driver's license from Defendant upon his initial contact with the vehicle. (Tr. 28). It did not seem to Detective Kirkby that Defendant had just been sleeping when the car

was pulled over. (Tr. 28). After Mr. Brown handed Detective Kirkby his license, Detective Kirkby immediately asked him to step out of the vehicle. (Tr. 28). Shortly after asking Mr. Brown to step out of the vehicle, Captain Hedrick arrived and parked his vehicle parallel to Detective Kirkby's vehicle on the right side. (Tr. 29).

Detective Kirkby testified that when he initially approached the vehicle and received Mr. Brown's driver's license, he indicated that if he ran the license and everything came back with no issues, he would be given a warning and would be free to leave. (Tr. 30). The warning would have been issued on paper per the department's policies. (Tr. 30-31).

After Captain Hedrick arrived, Detective Kirkby returned to the Toyota Camry, and Captain Hedrick began running Mr. Brown's license. (Tr. 31). At the time he handed Captain Hedrick the license, Detective Kirkby had just begun pulling up the correct screen on his computer to begin searching the databases. (Tr. 32). Detective Kirkby did not communicate to Captain Hedrick that if the license search returned without issues that Defendant and Mr. Brown would be allowed to return on their way because that is standard practice. (Tr. 33-34). Detective Kirkby testified that he told Mr. Brown at least once, perhaps twice, that he would be sent on his way as soon as the driver's license was run. (Tr. 34).

Detective Kirkby explained that to run a driver's license, there are four different screens that an officer has to cycle back and forth through to punch in the different information. (Tr. 34-35). After checking the license, to make sure its valid, then the vehicle's registration is searched, which takes a couple of minutes. (Tr. 35). Under the best circumstances, Detective Kirkby estimated that all of the searches could be completed in ten minutes. (Tr. 35). At the time Captain Hedrick arrived, Detective Kirkby had not run any of Mr. Brown's information. (Tr. 35-36).

After Captain Hedrick took over the search of Mr. Brown's license, Detective Kirkby

returned to the vehicle and talked to Defendant, who found the car's registration. (Tr. 36). Detective Kirkby then returned to the police vehicle. (Tr. 37). Detective Kirkby could tell that Captain Hedrick had begun checking the license. (Tr. 37). Detective Kirkby then again took over checking the license and Captain Hedrick went to the Toyota Camry.

Detective Kirkby testified that the inconsistencies between Mr. Brown and Defendant's stories and their nervousness was the reason the K-9 unit was walked around the vehicle. (Tr. 39). Detective Kirkby testified that people are generally nervous when stopped by police. (Tr. 39). Detective Kirkby testified that it is not unusual for a K-9 unit to go around a vehicle multiple times. (Tr. 41).

### B. Testimony of Captain Pete Hedrick

On direct examination Captain Pete Hedrick testified as follows. He is a captain with the Lee County Sheriff's Department and has worked there for 21 years. (Tr. 45). He participated in the traffic stop described by Detective Kirkby on April 12, 2013. (Tr. 45). Captain Hedrick arrived on scene at 2:02 a.m. (Tr. 45). When Captain Hedrick arrived on-scene Detective Kirkby was in the front right corner of his police vehicle speaking with the driver. (Tr. 45-46). Captain Hedrick pulled up in his car beside them. (Tr. 46). Captain Hedrick saw that Detective Kirkby was standing by his computer and had a warning ticket in his hand like he was about to issue a warning. (Tr. 46). Detective Kirkby handed Mr. Brown's driver's license to Captain Hedrick and told Captain Hedrick that he wanted to go back and talk to the passenger to retrieve the vehicle's registration. (Tr. 46). Captain Hedrick then began to check the driver's license and speak to Mr. Brown. (Tr. 46). Captain Hedrick had begun inputting some of the information necessary to check the license, when Detective Kirkby returned from talking to the passenger. (Tr. 47). Captain Hedrick gave the driver's license to Detective Kirkby who continued to check the license on his patrol vehicle's

computer. (Tr. 47).

Detective Kirkby then asked Mr. Brown for consent to search the vehicle and Mr. Brown indicated that it was actually Defendant's vehicle. (Tr. 47). Captain Hedrick then returned to the vehicle and ask Defendant if he would consent to a search of the vehicle. (Tr. 47-48). Defendant said that it was not his vehicle. (Tr. 48). Captain Hedrick asked Defendant to step back to the police vehicle because he had the intention to do a free air sniff around the vehicle. (Tr. 48). Captain Hedrick left Defendant in front of the police vehicle and then got his dog out. (Tr. 48).

Captain Hedrick walked directly to the back of the vehicle with the dog and before he could give the dog a command to start his free air sniff, the dog jumped towards the passenger window where Captain Hedrick had just been talking to the Defendant. (Tr. 48). This jump indicates that the dog had gotten into the odor of narcotics. (Tr. 48). The dog had a response trained change of his body, so that he became more tense and his ears perked up. (Tr. 48). Captain Hedrick still took him to the front of the vehicle where the dogs usually start so that they can get in a rhythm. (Tr. 48-49). Then Captain Hedrick gave the dog the command to begin the procedure, and the dog began to scan the vehicle in a counter clockwise motion. (Tr. 49). Captain Hedrick testified that the dog showed a behavior change at the driver's rear door, passenger's rear door, and at the passenger's front door again. (Tr. 49).

As soon as the dog alerted to the vehicle, Captain Hedrick opened the car door and removed the keys, which he put in his pocket. (Tr. 50). He returned his dog to his police vehicle. (Tr. 51). Afterwards, Captain Hedrick informed Mr. Brown and Defendant that his dog had alerted to the vehicle and that he was going to conduct a search. (Tr. 51). Captain Hedrick testified that from the time Mr. Brown and Defendant were stopped and the time they were apprehended for trying to flee, a total of 16 minutes had passed. (Tr. 53).

Captain Hedrick first searched the passenger front and found nothing. (Tr. 53). He then went to the trunk which contained two backpacks. (Tr. 53). The first backpack Captain Hedrick opened contained 3 kilograms of cocaine individually wrapped. (Tr. 53). Captain Hedrick then continued on to the driver's side to search. (Tr. 53). Captain Hedrick explained that it is bad for officer safety to just turn around after finding contraband. (Tr. 53). While he was at the driver's side of the vehicle he called for additional units. (Tr. 53). Afterwards, he approached Mr. Brown and Defendant and asked if they had ever been read their rights before. (Tr. 53). Mr. Brown then attempted to flee from the scene. (Tr. 53). A field test confirmed that the substance in the vehicle was cocaine. (Tr. 54).

On cross examination, Captain Hedrick testified that he told Mr. Brown that if everything checked out on his license that he would be free to leave. Captain Hedrick testified that he could "speed write" a warning ticket in about 30 seconds, but that it was not his job to do so. (Tr. 56). Captain Hedrick explained that issuing a ticket is not a deputy's only job during a traffic stop. (Tr. 57). Captain Hedrick related that there are several checks that a deputy is required to do when stopping a person. (Tr. 57). There are at least five different databases that must be checked to ensure that a person is legally allowed to drive. (Tr. 57). The deputies must talk to the person stopped to make sure that they understand the violation and to ensure that the person is in control of the motor vehicle and is not under the influence of alcohol or drugs. (Tr. 57).

Captain Hedrick testified that Mr. Brown appeared to be kind of flighty and would not hold still, pacing back and forth. (Tr. 59). As to Defendant, it struck Captain Hedrick as odd that he was a passenger in a vehicle stopped for a minor traffic infraction, but he still seemed nervous. (Tr. 60).

**III.     Analysis**

In his motion, Defendant argues that suppression is proper on numerous grounds. As stated by Defendant they are: (1) the seizure of Defendant's vehicle and person was not based upon probable cause; (2) the seizure of Defendant's vehicle and person was not based upon reasonable suspicion; (3) the warrantless arrest of Defendant was not made with probable cause; (4) the length of detention of Defendant exceeded the scope of the reason for the original detention, and thus the subsequent search, seizure and arrest of Defendant are void as fruit of the poisonous tree; (5) the warrantless search of Defendant's vehicle based upon the alleged alert of a canine unit was void for probable cause where the canine did not alert to the vehicle; (6) the warrantless search of Defendant's vehicle was based upon the alleged alert of a canine unit was void for probable cause where the canine utilized to sniff the vehicle was not trained to alert to the substance of cocaine; (7) any statements derived from Defendant are fruit of the illegal seizure or arrest of Defendant and must be excluded; (8) any statement derived from Defendant after his invocation of his right to counsel is inadmissible under the Fifth Amendment to the United States Constitution and *Miranda* doctrine; (9) any evidence derived from the vehicle or Defendant's person is fruit-of-the-poisonous tree from the warrantless seizure and must be suppressed; and (10) Defendant was subsequently arrested and questioned by police officers, and such arrest and interrogation resulting from an unlawful search of the premises requires suppression of Defendant's arrest and subsequent statements as fruit of the poisonous tree. (Doc. 29 p. 8-9). As will be shown below, none of these grounds justify the suppression of evidence in this case.

Before proceeding, however, the preliminary issue of whether Defendant has standing to challenge the stop and search of the vehicle must be considered. To bring a motion to suppress evidence derived from the search of a vehicle, defendants must show that they have standing to

challenge both the initial stop of the vehicle and standing to challenge the search of the vehicle. When a police officer stops a car for a traffic violation, the passengers within the care are considered seized under the Fourth Amendment. *Brendlin v. California,* 551 U.S. 249, 256 (2007). Thus, a passenger in a car stopped by police has standing to object to the constitutionality of the stop. *Id.* Accordingly, there is no question that Defendant, a passenger in the stopped vehicle, has standing to challenge the legality of the traffic stop.

Whether Defendant has standing to challenge the search of the vehicle is not so clear cut. The Supreme Court has long held that "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated." *U.S. v. Padilla,* 508 U.S. 77, 81 (1993) (emphasis in original) (citations omitted). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be asserted vicariously." *Alderman v. U.S.,* 394 U.S. 164, 174 (1969). A defendant must establish that he or she had a legitimate expectation of privacy in the place that was searched in order to assert a violation of the Fourth Amendment. *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980). The "legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. *Rakas v. Illinois,* 439 U.S. 128, 143 n.12 (1978). Although "[n]o one circumstance is talismanic to the Rakas inquiry," such factors as (1) whether the defendant had a possessory interest in the place searched or the property seized, (2) whether the defendant had the right to exclude others from that place, (3) whether the defendant exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether the defendant took precautions to maintain his privacy,

and (5) whether the defendant was legitimately on the premises. *U.S. v. Haydel,* 649 F.2d 1152, 1155-54 (5th Cir. 1981 Unit A July 1981) (citations omitted).

The Eleventh Circuit has ruled that a driver of a borrowed vehicle has an expectation of privacy in the borrowed vehicle, and therefore has standing to challenge a search of the vehicle by law enforcement. *U.S. v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987). While the Eleventh Circuit has not addressed whether a passenger borrower has standing to contest the search of a borrowed vehicle, other circuits have held that such passengers do have standing to contest search of their borrowed vehicles, at least where they borrowed the vehicle in collaboration with the driver. *See, e.g., United States v. Dunson*, 940 F.2d 989, 994-995 (6th Cir. 1991), *abrogated on other grounds by United States v. Ferguson*, 8 F.2d 385 (6th Cir. 1993); *United States v. Griffin*, 729 F.2d 475, n. 11 (7th Cir. 1984). The Court finds these cases highly persuasive that passenger borrowers have standing to challenge the search of the borrowed vehicle. In any event, the Court need not make an ultimate determination whether Defendant has standing to challenge the search of the vehicle because the search of the vehicle was legal.

**A. The Legality of the Traffic Stop**

A traffic stop is constitutional when law enforcement has probable cause to believe that a traffic violation has occurred. *See Whren v. U.S.,* 517 U.S. 806, 810 (1996). Under Florida law, the maximum allowable speed on limited access highways is 70 miles per hour. Fla. Stat. § 316.187(2)(a). Violation of the speed limit must be cited as a moving violation. Fla. Stat. § 316.187. In addition, it is unlawful for any person to operate a motor vehicle unless the person is restrained by a safety belt. Fla. Stat. § 316.614(4)(b).

In this case, Detective Kirkby testified that his radar unit measured the white Toyota Camry travelling 79 miles per hour, in excess of the speed limit. Detective Kirkby had probable

cause to believe that the traffic violation of speeding had been committed when he initiated the traffic stop.  Accordingly, Defendant's rights were not violated when Detective Kirkby stopped the vehicle in which he was a passenger.

### B. The Legality of the Search and Arrest

While Defendant claims a plethora of constitutional violations occurred during the stop, based on the uncontroverted testimony of Detective Kirkby and Captain Hedrick, and upon review of the video recording of the traffic stop, the Court finds that Defendant's constitutional rights were not violated during the traffic stop on April 12, 2013.

Contrary to Defendant's argument, law enforcement did not employ delay tactics to improperly detain Defendant beyond the scope of the reason for his original detention, i.e. to issue a warning for traffic violations.  In its recent case, *Rodriguez v. United States*, the Supreme Court reiterated that a traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest. *Rodriguez v. United States*, ___ S.Ct. ___, 2015 WL 1780927, at *5, (April 21, 2015) (citing *Knowles v. Iowa,* 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), in turn citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop . . . and to related safety concerns." *Id.* (internal citations omitted).  An officer's mission extends beyond the mere issuance of a ticket, but includes ordinary inquiries incident to the [traffic stop]." *Id.* at *6 (citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).  These inquiries include such things as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Id.*(citing *Delaware v. Prouse*, 440 U.S. 648, 658-

660 (1979)). Thus, a traffic stop may last no longer than is necessary to effectuate the purpose of the stop by addressing the traffic infractions. *Id.* In determining if a dog sniff is legal, the critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs—i.e., adds time to—the stop. *Id.* at *7.

Here, there is no evidence that Defendant was detained for a period of time longer than was necessary to effectuate the purpose of the stop. When Captain Hedrick arrived on-scene approximately 2 minutes after the traffic stop was initiated, he saw that Detective Kirkby had already begun issuing the warning, thus evidencing that the stop was being conducted expeditiously. At the hearing, Detective Kirkby estimated that under the best possible circumstances, all the checks that are conducted during a traffic stop would take 10 minutes. The circumstances in this case were not perfect, as Defendant and Mr. Brown initially could not locate their vehicle's registration. While the law enforcement inquiries were ongoing and before Mr. Brown was issued a warning, Captain Hedrick began conducting the dog sniff approximately 9 minutes into the stop.[2] In total, from the time Detective Kirkby initiated the stop to the time that Defendant and Mr. Brown were securely in custody, only approximately 14 minutes had elapsed.[3] Thus, even assuming that law enforcement did not have a reasonable suspicion that Mr. Brown and Defendant were engaged in illegal activity beyond the traffic infractions, Defendant's Fourth Amendment rights were not violated during the stop. *See Caballes*, 543 U.S. at 408 ("conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and

---

[2] The Court bases this finding on the uncontroverted testimony that Captain Hedrick arrived on scene at approximately 2:02 a.m., two minutes after the stop was initiated by Detective Kirkby, and began the dog sniff around the 6:50 minute mark in Government's Exhibit 1.

[3] This estimate is computed the same as above. Mr. Brown and Defendant are in custody at the 12:00 minute mark of Government Exhibit 1.

otherwise executed in a reasonable manner . . .") and *Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("Because we held that a dog sniff was not a search subject to the Fourth Amendment, we rejected the notion that the shift in purpose from a lawful traffic stop into a drug investigation was unlawful because it was not supported by any reasonable suspicion.") (citations omitted)).

Additionally, the Court finds that Detective Kirkby and Captain Hedrick had reasonable suspicion that Defendant and Mr. Brown were engaged in illegal activity beyond the traffic violations. Mr. Brown's attempt to conceal himself behind the B pillar of his car, his erratic driving upon seeing Detective Kirkby's police vehicle, Mr. Brown and Defendant's heightened and increasing nervousness, and their inconsistent statement concerning their trip all gave rise to a reasonable, specific, and articulable suspicion that criminal activity was afoot. An officer may prolong a traffic stop beyond its legitimate purpose in the limited circumstances where there is a "reasonable and articulable suspicion illegal activity has occurred or is occurring. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999). Thus, even if the Court was inclined to find that the traffic stop was conducted in a dilatory manner to accomplish the dog sniff, the reasonable suspicion law enforcement possessed justified any *de minimis* prolongation of the stop.

As for Defendant's remaining grounds for suppression, the Court does not see any basis to suppress evidence. While Defendant's motion argues that the canine utilized to sniff the vehicle was not trained to alert to cocaine, Captain Hedrick testified that he trained with Bucky for several years and understood Bucky's alerts to cocaine. This testimony was uncontroverted at the hearing and is credited by the Court. At the hearing, Defendant did not raise any argument calling into question the training of Bucky.

Defendant's motion also listed as a grounds for suppression that any statement derived from Defendant after his invocation of his right to counsel is inadmissible under the Fifth

Amendment to the United States Constitution and *Miranda* doctrine. Defendant's motion does not otherwise argue that a *Miranda* violation occurred during the traffic stop and no such allegation was made at the hearing. The record before the Court does not present any *Miranda* issue. The Court will not suppress any such evidence on this ground.

For the reasons explained above,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress Tangible Evidence and Statements; Memorandum of Law and Specific Request for Evidentiary Hearing (Doc. 29) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on May 12, 2015.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**
Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties